IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TROY HOPKINS and TAMMY HOPKINS,** | : | **CIVIL NO.1:CV-06-323** |
| | : | |
| **Plaintiffs,** | : | **JUDGE SYLVIA H. RAMBO** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN VAUGHN, II, in his individual capacity, DAVID STEFFEN, in his individual capacity, NORTHERN YORK COUNTY REGIONAL POLICE DEPARTMENT, and CARL SEGATTI, in his official capacity as Chief of Police,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## M E M O R A N D U M

The instant action arises out of a case of mistaken identity in a bank robbery investigation.  Plaintiffs Troy and Tammy Hopkins commenced this action pursuant to 42 U.S.C. § 1983, alleging that they were unlawfully seized in violation of the Fourth Amendment by officers in the Northern York County Regional Police Department.  Before the court is Defendants' motion for summary judgment (Doc. 26).  Defendants claim that their seizure and detention of Plaintiffs was justified under the Fourth Amendment, and that they are entitled to qualified immunity.   For the reasons that follow, the motion will be granted in part and denied in part.

I.          **Background**

    A.       **Facts**

The facts, viewed in the light most favorable to Plaintiffs,[1] are as follows:

1.          **Sovereign Bank Robbery Investigation**

Throughout late 2004 and 2005, an armed robber struck a number of Sovereign Banks in York County, Pennsylvania.  (Defs.' Stmt. of Facts Not in Dispute ¶ 2.)  A task force of multiple police departments in the area was formed. The Northern York County Regional Police Department participated in the task force.  Based on information from the previous robberies, the task force compiled a description of the suspect.  The robber was variously described as 5'10 to 6' feet tall, and weighing approximately 185-200 pounds.  This description was distributed to all participants in the task force.  In addition to the physical description of the suspect, the task force issued the following description of the modus operandi of the robber:  The robber always approached the bank on foot, and always around closing time.  The robber always carried a bag, either black plastic or clear, and he carried a gun.  The suspect was always covered from head to toe, wearing a ski mask and gloves.  (*See* Pls.' Ex. C.)

Additionally, the Northern York County Regional Police Department compiled its own description of the suspect based on the information provided by the task force. (Vaughn Dep. Ex. 2, Aug. 30, 2006.)  The description is as follows: "Suspect Description: Black, male, 6'+, Muscular Build, Possibly wearing soft body armor, Full face ski-type mask.  MO: Displays a weapon, produces a bag for tellers and demands money.  Has become more aggressive.  Thought to be a second person

---

[1] The facts are undisputed except where noted.

involved as a driver (unconfirmed at present).  Possible suspect vehicle: Silver-Gray Dodge Stratus/Aspen/Neon." (*Id.*)

The Northern York County Regional Police Department set up a surveillance operation at a Sovereign Bank at 500 Greenbriar Road in York. Sergeant Detective Steffen oversaw the operation. (*Id.* 23:13-20.)  This bank was chosen because it was the only Sovereign Bank within the jurisdiction of the Northern York County Regional Police Department.  None of the previous robberies had occurred within the boundaries of the Department. (*Id*. 22:10-15.)  The surveillance detail had been in place for approximately two weeks before the incident in question.  (*Id.* 34:1-2.)

The surveillance detail worked as follows.  One officer observed the front door of the bank from a vehicle parked across the street from the bank. Another officer was in an unmarked vehicle behind the bank in radio contact with the other officer.  On most nights a third unoccupied vehicle contained a camera trained on the front door of the bank. (*Id*. 54:21-24.)  The camera could be activated via a remote control operated by the officer viewing the front of the bank. (*Id.* 57:8-20.)

### 2.   Events of February 9, 2005

#### i.   Defendants' Observations at the Bank

Detective John Vaughn was conducting surveillance of the front entrance to the Sovereign Bank that evening.  Detective Migatulski was stationed in an unmarked car behind the bank.  Detective Vaughn observed Mr. Hopkins pull up to the drive through, about fifty feet in front of his own vehicle. (*Id.* 98:12.)  He saw the driver press the button for service at the drive through, and noticed that as the driver waited for service, a bank employee locked the front door. (*Id*. 99:10-17.)  He then saw the vehicle pull up to the front of the bank, parking perpendicular to the

marked spaces.  He observed the driver for two or three seconds as he exited the vehicle and approached the door.  Vaughn saw that the driver was a large black male, wearing baggy clothing, but no head covering, and carrying something white in his hand.  (*Id*. 114:1-19.)

### ii.  Plaintiffs' Perspective

On Wednesday, February 9, 2005, around 5:55 p.m., Plaintiff Troy Hopkins drove to the Sovereign Bank on Greenbriar Road in York to deposit his paycheck.  In the front seat of the vehicle was his wife Tammy Hopkins, and seated in the backseat were the couple's two children.  (Troy Hopkins Dep. 51:5-12.)[2]  The family was traveling in a Ford Expedition.  (*Id*. 15:25-17:8.)  Troy Hopkins is an African-American male.  His height is 6'1", and in early 2005 he weighed approximately 370-373 pounds.  (*Id*. at 38:19-24.)  On this evening, Mr. Hopkins was wearing gray sweat pants, a T-shirt, and a blue winter jacket.  (*Id*. 35:17-36:1.)  He was not wearing a hat or gloves.  (*Id*.)

Mr. Hopkins pulled up through the drive through to the teller's window and waited but received no service.  (*Id*. 45:24-47:8.)  After a few minutes, he pushed the call button but no one answered, although the lights were still on inside the bank.  (*Id*. 46:22-47:20.)  Unaware that the front entry had been locked, and hoping to cash his check before the bank closed short time later, Mr. Hopkins pulled up to the entrance of the bank and put the vehicle in park, parallel with the entrance.  (*Id*. 49:11-25.)  He exited the vehicle, leaving it running with the lights on.  (*Id*. 52:7-23.)  Mr. Hopkins walked up to the entrance with his paycheck in hand.  (*Id*. 53:19-54:7.)  The lights were still on inside, but he tried the door once, only to find it was

---

[2]  The parties also submitted a transcript of Tammy Hopkins' deposition, which the court considered, but does not cite here.  All references to "Hopkins Dep." refer to Troy Hopkins, not Tammy Hopkins.

locked.  (*Id*. 56:4-57:7.)  He then returned to the car and told his wife Tammy that he had just missed the bank.  (*Id*. 58:22-59:14.)

### iii. __Felony Stop__

As Plaintiffs drove away, Detective Vaughn contacted Sergeant Stephen and informed him that he observed a large black male attempt to enter the bank at closing time with something white in his hand. (Steffen Dep. 46:21-47:4, Aug. 30, 2006.)  After receiving this report, Detective Vaughn, Detective Migatulski and a number of other police officers followed Plaintiffs' vehicle as it turned on Greenbriar Road and then Roosevelt, before turning on Route 30.  During this time, the officers ran a record check of the Hopkins' vehicle, and the dispatcher said that no record was available.[3]  (Vaughn Dep. 134:9-15).

As the officers followed Plaintiffs, Detective Steffen authorized a felony stop of the vehicle.[4]  (*Id*. 127:13-18.)  Altogether, the stop involved six officers and five police vehicles, and blocked traffic on Route 30.  (Migatulski Dep. 42:18-21, Oct. 17, 2006.)  The officers all drew their service weapons and pointed them at the vehicle.  (Vaughn Dep. 139:1-2; 140:6-8.)  Through a loudspeaker, Troy Hopkins was ordered to roll down his window, turn off the ignition to the vehicle,

---

[3] In fact, Plaintiffs' vehicle was registered to the Heart of God Christian Worship Center, where Plaintiffs are both pastors.  (*Id*. at 12:15-14:15.)  The record is silent as to if, when, or how Defendants learned of the vehicle's registration.  Additionally, the court cannot determine from the parties' submissions the significance of a record check coming back with no record available.  These are unresolved issues of fact, and will be construed in the light most favorable to Plaintiffs for the purpose of this motion.

[4] The parties dispute whether Mr. Hopkins committed any moving violations immediately prior to the stop and if so, what role these alleged violations may have played in Defendants' decision to stop and detain Plaintiffs.  Plaintiff asserts that no moving violations were committed, while Defendants maintain that Plaintiff exceeded the speed limit and made improper lane changes, and that this bolstered their suspicions of criminal activity.  In any event, there is no dispute that Defendants effectuated a felony stop of Plaintiffs on suspicion of bank robbery—not for any alleged traffic violation.  For the purpose of summary judgment, the court will accept Plaintiffs' contention that no moving violations were committed.

drop the keys outside the window, put his hands outside the door, and open it from the outside.  (Hopkins Dep. 72:13-73:15.)  Mr. Hopkins obeyed the officers' commands and exited the vehicle as instructed.  He then backed away from his vehicle with his hands in the air.  (*Id*. 74:23-75:22.)  When Mr. Hopkins reached the officers, he was ordered to get down on his knees in the middle of the street and put his hands behind his head.  (*Id*. 76:1-22.)  Officers attempted to handcuff Mr. Hopkins behind his back, but his hands would not reach, so he was handcuffed in front.  Throughout this time, Mr. Hopkins asked why he was being handcuffed and explained that he was a pastor at a local church.  (*Id*. 76:22-77:21.)  At some point, an officer informed Mr. Hopkins that the officers were looking for a bank robber and Mr. Hopkins resembled the suspect.  (*Id*. 86:1-87:12.)  Mr. Hopkins reiterated that he was a local pastor, not a bank robber.  (*Id.*)

A few minutes after Mr. Hopkins had been handcuffed, Mrs. Hopkins exited the car, walked toward the officers, and asked what was going on.  (*Id*. 81:5-21.)  She was ordered to her knees and handcuffed as well.  (*Id.*)  As the officers placed the cuffs on her, they caught in her hair, causing her to cry out in pain.  At some point, Mr. and Mrs. Hopkins explained that their children were in the car.  (*Id*. 93:21-25.)  The police went to the vehicle and confirmed that there were children present, but the handcuffs remained on and Mr. and Mrs. Hopkins were not free to leave.  Throughout the stop, Mr. and Mrs. Hopkins remained calm and cooperative, and did use any profanity.

The Hopkinses remained handcuffed as the officers walked around and talked to each other.  After about a half hour had elapsed, the handcuffs were removed.  (*Id*. 97:10-12.)  The record is silent about the steps taken by police to determine that Mr. Hopkins was not involved in the robberies.  After the handcuffs

were removed, they were detained an additional ten to fifteen minutes before they were told that they were free to go.

Altogether Mr. and Mrs. Hopkins were detained for forty minutes before they were free to leave.  Before they left, one of the officers said he wanted to show them a photograph.  (*Id*. 104:5-9.)  The photograph was a suspect in the robberies, an African-American male who was bald and had an earring and a goatee. (*Id*. 108:19-20.)  Mr. Hopkins told the officer he looked nothing like the photograph. (*Id.*)  A short time later, Detective Vaughn asked the Hopkins not to publicize their stop because that would jeopardize the surveillance operation that the police planned to continue.  (Vaughn Dep. 150:6-12).  Additionally, Sergeant Gearhart told them that one day they would look back on this incident with friends and laugh about it. (*Id*. 150:14-151:5.)

## B.    Procedural History

On February 13, 2006, Plaintiffs filed a complaint against Northern York County Regional Police Department and individual Defendants under 42 U.S.C. § 1983 for violation of their Fourth Amendment right to be free from unreasonable seizure.  (Doc. 1.)  An amended complaint was filed on September 19, 2006.  (Doc. 14.)  Defendants moved for summary judgment on April 9, 2007 (Doc. 26.)  Their supporting brief was filed on the same day.  (Doc. 28.)  Plaintiffs filed their brief in opposition on April 26, 2007.  (Doc. 32.)  Defendants filed a reply brief on May 10, 2007.  (Doc. 49.)  Accordingly, this matter is ripe for disposition.  For the reasons that follow, the court will deny Defendants' motion for summary judgment.

## II.        Legal Standard

_____Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 248. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322-23. " 'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of

the court) than a preponderance.' " *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.     Discussion

Defendants assert that they are entitled to summary judgment on the issue of qualified immunity because their stop of Plaintiffs was justified.  Plaintiffs argue that summary judgment should not be granted because the evidence, viewed in the light most favorable to them, demonstrates that they were unlawfully seized in violation of the Fourth Amendment.  Additionally, Defendants seek summary judgment on the issue of punitive damages.  These arguments will be addressed in turn, viewing the facts in the light most favorable to Plaintiffs.

### A.     Qualified Immunity

"The general rule of qualified immunity is intended to provide government officials with the ability reasonably to anticipate when their conduct may give rise to liability for damages.  Where that rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." *Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (quotation and citation omitted).  The Supreme Court set forth the order of inquiry on qualified immunity claims in *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[5]  *See also Wright v. City of Phila.*, 409 F.3d 595, 600-01 (3d Cir. 2005).  The

---

[5]  The Supreme Court has indicated its willingness to reconsider the "rigid order of battle" prescribed by *Saucier* which places the constitutional question as the first item for analysis.  *See Pearson v. Callahan*, No. 07-751 (granting certiorari and directing the parties to brief the issue of whether *Saucier* should be overruled); *see also Scott v. Harris*, — U.S. —, 127 S. Ct. 1769, 1774 n.4 (2007).  Justice Breyer has repeatedly argued that a trial court should be permitted to determine the qualified immunity question before reaching the constitutional question, depending on the facts and law presented in each case.  *See Morse v. Frederick*, — U.S. —, 127 S. Ct. 2618, 2641-42 (2007) (Breyer, J., dissenting); *Brosseau v. Haugen*, 543 U.S. 194, 201-02 (2004) (Breyer, J., concurring).  Legal scholars

(continued...)

threshold question is this: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201; *accord Scott v. Harris*, — U.S. —, 127 S. Ct. 1769, 1774 (2007). If no constitutional violation is shown, the inquiry need not progress because the officers are entitled to judgment in their favor. *Saucier*, 533 U.S. at 201.

If the facts alleged demonstrate a constitutional violation, the court must ask whether the constitutional right was clearly established at the time, in light of the specific context of the case at bar. *Id.*; *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). The "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Anderson*, 483 U.S. at 640 ("in the light of pre-existing law the unlawfulness must be apparent"). If the constitutional right was not clearly established at the time of the incident in question, summary judgment must be granted for the officer. *Saucier*, 533 U.S. at 202.

If, however, the constitutional right was clearly established, the court must determine whether the officer made a reasonable mistake about what the law required of him at the time. *Anderson*, 483 U.S. at 641; *Carswell v. Borough of*

---

(...continued)

and other judges are of the same mind as Justice Breyer. *See Morse*, 127 S. Ct. at 2642 (collecting criticism of *Saucier*'s rule). The critics' strongest argument is that the *Saucier* analysis requires a court to reach and decide sometimes-difficult constitutional questions when an issue could be more easily resolved under the principles of qualified immunity. This practice may waste judicial resources and shield an erroneous constitutional holding from correction on appellate review. *Id.* at 2641. It certainly requires a court to "violate[ ] the longstanding principle that courts should 'not . . . pass on questions of constitutionality . . . unless such adjudication is unavoidable.'" *Id.* (quoting *Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944)).

While *Saucier* may be falling out of favor for good reason, it remains the law of the land. Thus, this court will proceed with the analysis as prescribed.

*Homestead*, 381 F.3d 235, 242 (3d Cir. 2004).  "It is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."  *Saucier*, 533 U.S. at 205.  Thus, for example, an officer "can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause . . . and in [that] situation[ ] courts will not hold that they have violated the Constitution."  *Id.* at 206.

The Third Circuit recently clarified the respective roles of the court and the jury on the question of qualified immunity.  "[W]hether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury."  *Curley*, 499 F.3d at 209; *Carswell*, 381 F.3d at 242.  If there are material facts in dispute regarding the event or events in question, a jury may make findings of fact to assist the court in determining whether the officer's mistake was reasonable and qualified immunity applies.  *Curley*, 499 F.3d at 211; *Carswell*, 381 F.3d at 242.  Here, the qualified immunity analysis turns on whether Defendant's actions in stopping Plaintiffs on suspicion of bank robbery and detaining them in handcuffs in excess of forty minutes violated the Fourth Amendment.

1.     <u>**Viewing the facts in the light most favorable to Plaintiffs, was a constitutional right violated?**</u>

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  Here there can be no doubt that Plaintiffs were seized when Defendants effectuated a felony stop of their car with guns drawn and handcuffed them.  *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Florida v. Royer*, 460 U.S. 491, 501-02 (1983) ("A person has been 'seized' within the meaning of the Fourth Amendment only if, in

view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). However, the parties dispute whether the encounter constituted an arrest or an investigatory detention, and whether Defendants were justified in seizing Plaintiffs under either standard. Plaintiffs claim that they were arrested, and that the arrest was without probable cause. Defendants assert that Plaintiffs were subjected to an investigatory detention, and that the lower standard of reasonable suspicion was satisfied.

An arrest is valid where, "at the moment the arrest was made, the officers had probable cause to make it—[when] at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *see also Dunaway v. New York*, 442 U.S. 200 (1979); *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995) ("[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested").

By contrast, probable cause is not required for investigative detentions that fall short of an arrest. *Terry v. Ohio*, 392 U.S. 1 (1968). Instead, a law enforcement officer may make a brief stop of a suspect if there is reasonable suspicion to believe that criminal activity is afoot. *Id.* at 21-22. A suspicions is reasonable only if supported by specific, articulable facts, not just a hunch. *Id.* The stop must be justified at its inception and "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20. However, a stop which begins as an investigatory detention may ripen into an arrest

if the police fail to act diligently to confirm or dispel their suspicions. *United States v. Sharpe*, 105 U.S. 675, 686-87 (1985).

There is no bright line rule to distinguish between an arrest and a *Terry* stop. Instead, the Supreme Court has explained that

> [t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short amount of time.

*Florida v. Royer*, 460 U.S. 491, 500 (1983). "Circumstances which indicate an arrest include: the blocking of an individual's path or the impeding of his progress; the display of weapons; the number of officers present and their demeanor; the length of the detention; and the extent to which the officers physically restrained the individual." *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989); *see also Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (1995). "There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest. But use of guns and handcuffs must be justified by the circumstances." *Baker*, 50 F.3d at 1193.

The court will evaluate the initial stop and Plaintiffs' subsequent detention separately, first determining the appropriate standard, and then determining whether Defendants' actions satisfied that standard.

### a. <u>Initial Stop</u>

Viewing the facts in the light most favorable to Plaintiffs, the initial stop was an investigative detention, rather than an arrest. Defendants believed they were stopping an armed bank robber who had previously taken hostages. Though the force used was extreme—the stop involved guns drawn, numerous officers, and handcuffs—so too was the threat to which the officers believed they were

responding—that of a violent and armed bank robber.  Thus the force used was proportionate to the threat perceived, and given these circumstances, the court cannot conclude that the initial seizure of Mr. Hopkins constituted an arrest.

However, the question remains whether Defendants were justified in their belief that Mr. Hopkins was the bank robber they were seeking.  Because the scope of this intrusion was so severe, the justification for this investigatory detention must be much higher than that required for the minimally intrusive "stop and frisk" contemplated in *Terry*, to a level approaching probable cause.  As the Supreme Court explained in *Dunaway*, in evaluating the constitutionality of an investigatory detention, a court must balance the force used against the individual against the opposing interest of law enforcement in detecting crime.  442 U.S. at 209.  To evaluate the law enforcement's interest, the court must examine both the threat to which the officers believe they are responding, and the strength of the facts leading them to believe that the individual seized poses that threat.  *Id.*

Here, Plaintiffs were stopped based on Detective Vaughn's observation of what he described as a large black man attempting to enter the Sovereign Bank near closing time with something in his hand.  Whether Defendants' suspicion of Mr. Hopkins was reasonable turns on how closely Vaughn's observation matched the description of the robber they were seeking.

The court finds two recent Third Circuit cases addressing the issue of suspect identification particularly instructive.  In *United States v. Brown*, the Third Circuit held that a description of two robbery suspects in Philadelphia as "African-American males between 15 and 20 years of age, wearing dark, hooded sweatshirts, and running south on 22nd Street, where one male was 5'8" and the other was 6'" was too general to provide reasonable suspicion.  448 F.3d 239, 247 (2006) Moreover, the court held that the individuals stopped in *Brown* did not match even

this general description because they were 28 and 31 respectively, and had full beards, while the description lacked any mention of the suspects's facial hair. *Id.* at 248.

Similarly, in *United States v. Kithcart*, the court held that the description "two African-American men in a sports car" was too general to provide probable cause to support the arrest of a lone African-American male in a sports car shortly after the robbery. 134 F.3d 529, 531-32 (3d Cir. 1998). The court also noted that witnesses provided a precise description of the suspect's vehicle—"possible Z-28, possible Camaro"—but that the defendant was observed driving a Nissan 300ZX, a sports car with a different body shape than the possible vehicle types identified by the witness. *Id.* at 531. The court concluded that, "armed with information that two black males driving a black sports car were believed to have committed three robberies in the area some relatively short time earlier, [the officer] could not justifiably arrest any African-American man who happened to drive by in any type of black sports car." *Id.* at 532.

From these decisions, this court discerns two guiding principles on the subject of suspect identification: The first is that the more general the description of a suspect, the less likely it is that any given individual meeting that description is the suspect. Conversely, the more unique and particular the description, the more exact a match is required. With this standard in mind, the court will evaluate whether Defendants' suspicion that Mr. Hopkins was the bank robber was reasonable, viewing the facts in the light most favorable to Plaintiffs.

Here, according to Defendants Mr. Hopkins matched the description of the robber because he was a large black man and he attempted to enter a Sovereign Bank near closing time with a white object in his hand. If this were the only description that Defendants had for the suspect they were seeking, it may well have

been too general.  *See Brown*, 448 F.3d at 247-48.  However, Defendants had a far more specific description of both the suspect and his behavior than simply a "large black man" who entered banks near closing time.  With respect to his physical appearance, the robber was variously described as being between 5'10" to 6' feet tall, and weighing approximately 185-200 pounds.  At 380 pounds, Mr. Hopkins weighed almost twice as much as the suspect police were seeking.

Additionally, Mr. Hopkins' behavior differed in critical ways from the descriptions of the bank robber provided by witnesses.  Based on a half dozen prior observations of the robber and his behavior by customers and bank employees, the police knew that the robber had always concealed his features by wearing a hat or mask and gloves, and always approached on foot, carrying a gun and a bag.  Here, Mr. Hopkins took no steps to obscure his features, nor did he approach the bank on foot carrying a gun or a bag.  Significantly, Detective Vaughn observed Mr. Hopkins pull up to the teller's window and seek service prior to trying the front door.  This action should have alerted Defendants that they were observing a customer, not a robber.  Moreover, it is totally inconsistent with the behavior of the bank robber police were seeking, who had always approached on foot.  Altogether, viewing these facts in the light most favorable to Plaintiffs, Defendants lacked reasonable suspicion to believe that Troy Hopkins was the bank robber they sought, and thus the initial stop was unlawful.

### b. <u>Prolonged Detention of Plaintiffs</u>

Even if Defendants had been justified in initially detaining Plaintiffs, their prolonged detention was also unlawful.  Upon stopping Plaintiffs, Defendants were required to act diligently to confirm or dispel their suspicions.  *See Terry*, 392 U.S. at 21-22.  Viewing the facts in the light most favorable to Plaintiffs, they failed to do so.

Plaintiffs were handcuffed and detained for forty minutes, but the record is silent as to what steps, if any, Defendants took to confirm or dispel their suspicion that Mr. Hopkins was the robber they sought.  Throughout their detention, Plaintiffs clearly identified themselves to the officers, asked why they were being detained, and insisted that they were innocent.  Additionally, the presence of Mrs. Hopkins and the couple's two children in the car made it far less likely that Mr. Hopkins could have been the robber.  These facts, viewed in the light most favorable to Plaintiffs, establish that not only the initial stop, but also the prolonged detention of Plaintiff violated the Fourth Amendment.

## 2.    Did Defendants Act Reasonably in Light of Clearly Established Law?

This inquiry as to whether a right was clearly established is governed by the specific context of the case, not by broad propositions of law.  *Saucier*, 533 U.S. at 202; *Curley*, 499 F.3d at 207; *Bartholomew v. Pennsylvania*, 221 F.3d 425, 429 (3d Cir. 2000).  There can be no doubt that the right to be free from unreasonable seizure was clearly established at the time Defendants stopped and detained Plaintiffs.  As discussed above, the controlling precedent in this case are the Supreme Court cases in *Terry*, 392 U.S. 1 and *Royer*, 460 U.S. at 500, and the requirements for an investigatory detention are well-settled.

Moreover, at this stage in the litigation, viewing Detective Vaughn's observations in the light most favorable to Plaintiffs, a reasonable officer in Defendants' position would have understood that there was no reasonable suspicion to believe Mr. Hopkins was the bank robber.  *See Anderson*, 483 U.S. at 641.  It should have been apparent to the officers that both the initial stop and prolonged detention were unlawful.  The court notes that disputed issues of fact remain in this

case,[6] and that depending on the factual findings made at trial, qualified immunity may apply.  *See Curley*, 499 F.3d at 210 (holding that it is the role of the jury at trial to resolve disputed questions of fact, but that the court must determine the availability of qualified immunity as a matter of law).  However, at the summary judgment stage, viewing the facts in the light most favorable to Plaintiffs, Defendants are not entitled summary judgment on the issue of qualified immunity.

### B.   <u>Punitive Damages</u>

Defendant argues that summary judgment should be granted in their favor on Plaintiffs' claims for punitive damages.  The court agrees that Plaintiffs' claim for punitive damages against Northern York County Regional Police Department fails as a matter of law.  "[A] municipality is immune from punitive damages under 42 U.S.C. § 1983."  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *accord Bolden v. Southeastern Pa. Transp. Auth.*, 953 F.2d 807, 829 (3d Cir. 1991).

However, Plaintiffs also seek punitive damages from the individual Defendants in their individual capacities.  A defendant will be liable for punitive damages under § 1983 when a plaintiff shows the defendant's conduct to be "at a minimum, reckless or callous."  *Brennan v. Norton*, 350 F.3d 399, 428-29 (3d Cir. 2003) (quoting *Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989)).  Such damages will also be allowed if the defendant's conduct was "intentional or motivated by evil motive," but this higher standard is not required.  *Id.* at 429. Punitive damages, however, "require more than the retaliatory motive itself."  *Id.* at 429-30.  Defendants' motives and subjective beliefs are an issue of disputed fact.

---

[6] For instance, the parties dispute whether Mr. Hopkins committed any traffic violations prior to the stop.  Additionally, the court notes that the record is silent as to the steps taken by Defendants to confirm or dispel their suspicions of Plaintiffs during the stop.

Accordingly, the court will defer ruling on the issue of punitive damages against the individual Defendants until all evidence has been presented at trial.

**IV.**      **Conclusion**

     In accordance with the foregoing discussion, Defendants' motion for summary judgment will be granted in part and denied in part.  The motion will be granted with respect to punitive Plaintiffs' damages claim against Northern York County Regional Police Department.  It will be denied in all other respects.  An appropriate order will issue.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  May 12, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TROY HOPKINS and TAMMY HOPKINS,** | : | **CIVIL NO.1:CV-06-323** |
| **Plaintiffs** | : | **JUDGE SYLVIA H. RAMBO** |
| **v.** | : | |
| **JOHN VAUGHN, II, in his individual capacity, DAVID STEFFEN, in his individual capacity, NORTHERN YORK COUNTY REGIONAL POLICE DEPARTMENT, and CARL SEGATTI, in his official capacity as Chief of Police,** | : | |
| **Defendants** | : | |

## O R D E R

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT**:

1)      Defendants' motion for summary judgment (Doc. 26) is **GRANTED IN PART AND DENIED IN PART** as follows:

a)  The motion is **GRANTED** with respect to Plaintiffs' claim against Northern York County Regional Police Department for punitive damages.

b)  In all other respects, the motion is **DENIED**.

2) The Clerk of Court shall defer the entry of the partial grant of summary judgment until the conclusion of this case.

3)  All motions *in limine*, if any, accompanied by supporting briefs, shall be filed no later than August 11, 2008.  Responses to any motions *in limine* shall be filed no later than August 21, 2008.  Replies to any motions *in limine* shall be filed no later than August 28, 2008.

4)   Pretrial memoranda, proposed *voir dire* and proposed jury instructions shall be filed no later than noon on Thursday, September 11, 2008.

5)   The pretrial conference will be held at 2:30 p.m. on Thursday, September 18, 2008 in the chambers of Courtroom No. 3.

6)   This case is placed on the October 2008 trial list.  Jury selection for cases on the October list will begin at 9:30 a.m. on Monday, October 6, 2008 in Courtroom No. 3, Eighth Floor, Federal Building, Third and Walnut Streets, Harrisburg, Pennsylvania.  Trials will commence following the completion of jury selections.  A date certain for trial may be discussed at the pretrial conference; however, counsel are expected to be prepared to go forward with trial at anytime during the trial term.

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated:  May 12, 2008.